## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**B.F., through next friend, Janice Falk,** *et al.*,

*Plaintiffs*,

v.

**RAFAEL J. LÓPEZ,** *et al.*,

*Defendants.*

**Case No. 1:23-cv-00109-JRR**

## <u>MEMORANDUM OPINION</u>

Pending before the court is Defendants Rafael J. López and Alger Studstill's Motion to Dismiss Plaintiffs' Amended Complaint and Request for a Hearing at ECF No. 78 (the "Motion"). The court has reviewed all papers. Notwithstanding Defendants' request for same,[1] the court has determined that no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, the Motion will be granted in part and denied in part.

## I.    <u>BACKGROUND</u>[2]

On behalf of themselves and those similarly situated, Plaintiffs B.F. through his next friend Janice Falk, Y.C. through his next friend Sara Adams, and Y.D. through her next friend Christy L. Emely bring this action against Defendants Rafael J. López, in his official capacity as Secretary of the Maryland Department of Human Services ("DHS") and Alger M. Studstill, in his official capacity as Executive Director of the Maryland Social Services Administration ("SSA") (collectively referred to herein as "the State"), alleging violations of substantive and procedural

---

[1] Plaintiffs subsequently joined in this request following the Supreme Court's decision in *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357 (2025).

[2] For purposes of resolving the Motion, the court accepts as true all well-pled facts set forth in the Class Action Amended Complaint for Injunctive and Declaratory Relief. (ECF No. 75.) *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

due process under the Fourteenth Amendment and violation of the Federal Adoption Assistance and Child Welfare Act ("AACWA") under Title IV-E of the Social Security Act. (ECF No. 1.)

Plaintiffs, who are in the foster care custody of the State, allege they have "suffered harm or face an unreasonable risk of harm from Defendants' failure to implement known systemic safeguards to protect them from the unwanted, unsafe, or unnecessary use of psychotropic medications." (ECF No. 84 at p. 1.) Specifically, they allege the State has failed to properly oversee the administration of psychotropic medications to children in its legal custody based generally on its failure to maintain adequate medical records for children in foster care, its failure to maintain an adequate informed consent process for the provision of psychotropic medications, and its failure to operate an adequate secondary review system for prescriptions of psychotropic medications. (ECF No. 75 ¶ 10.)

Relevant here:

> Psychotropic medications are powerful drugs that directly affect chemicals in the brain that help to regulate emotions and behavior. They include anti-anxiety agents, antidepressants, mood stabilizers, stimulants, antipsychotics, and alpha agonists. They also include medications from the anticonvulsant and antihypertensive drug classes when the medication is prescribed for a behavioral health indication. Children administered these medications face a greater risk of harmful physical and emotional side effects than adults. Harmful physical and emotional side effects may include but are not limited to seizures, suicidal thinking and behavior, irreversible movement disorders, adverse cardiovascular and respiratory effects, severe liver disease, excessive weight gain, and unexpected death. As research on the pediatric use of psychotropic medications lags behind prescribing trends and prescriptions to children often are made without prior U.S. Food and Drug Administration ("FDA") approval, the full spectrum of short- and long-term side effects is unknown.

*Id.* ¶ 5.

## A. Relevant Statutory, Regulatory, and Policy Framework

### 1. Children in Need of Assistance

"When a child suffers abuse or neglect or has a developmental or mental disability and lacks a caretaker to give proper attention to his or her needs, a local department of social services may petition the juvenile court for a determination that the child is a [child in need of assistance ('CINA')]." *In re Ashley S.*, 431 Md. 678, 685 (2013) (quoting MD. CODE ANN., CTS. & JUD. PROC. §§ 3-801(f), 3-809(a)). The relevant procedures governing same are set forth in Maryland Code, Courts & Judicial Proceedings Article ("CJP"), § 3-801 *et seq.*, and Family Law Article ("FL"), § 5–524 *et seq. Id.* Children subject to a judicial CINA determination are represented by counsel. CJP § 3-813(d)(1).

Once a child is determined to be a CINA, the juvenile court "may leave the child in the child's current custody; commit the child to the custody of a parent, a relative, or another suitable individual; or commit the child to the custody of the local department of social services or [DHS] for placement in foster, kinship, group, or residential treatment care." *In re Ashley S.*, 431 Md. at 685–86 (citing CJP § 3-819(b)(1)(iii); FL §§ 5-501(m), 5-525(b)). Upon such a finding, the court may also "[g]rant limited guardianship to [DHS] . . . for specific purposes including medical . . . purposes . . . if a parent is unavailable, unwilling, or unable to consent to services that are in the best interest of the child." CJP § 3-819(c)(1)(ii). Plaintiffs' claims arise from their placement in DHS's legal custody. (ECF No. 75 ¶¶ 26, 32, 47, 60.)

The juvenile court has "exclusive original jurisdiction" over all proceedings "arising from a petition alleging that a child is a CINA." *Id.* § 3-803(a)(2). The juvenile court conducts a "hearing to review the status of each child under its jurisdiction within 6 months after the filing of the first petition . . . and at least every 6 months thereafter." *Id.* § 3-816.2(a)(1). At these hearings,

3

the court evaluates the safety of the child and determines "the appropriateness of and extent of compliance with the case plan for the child," which includes, among many other things, the child's medications. *Id.* § 3-816.2(a)(2)(i), (iii); COMAR 07.02.11.13. The juvenile court also has authority to order DHS "to make or arrange for a study concerning the child, the child's family, the child's environment, and other matters relevant to the disposition of the case." CJP § 3-816(a). This can include "that the child . . . be examined at a suitable place by a physician, psychiatrist, psychologist, or other professionally qualified person." *Id.* § 3-816(b)(1).

### 2. Relevant Federal Laws Regarding the State's Responsibilities for Children in Foster Care

Pursuant to 42 U.S.C. § 622(a), to be eligible for funding under the Child Welfare Act, a State must have a plan for child welfare services. 42 U.S.C. § 622(a). This plan must include, *inter alia*:

> [A] plan for the ongoing oversight and coordination of health care services for any child in a foster care placement, which shall ensure a coordinated strategy to identify and respond to the health care needs of children in foster care placements, including mental health and dental health needs, and shall include an outline of . . . the oversight of prescription medicines, including protocols for the appropriate use and monitoring of psychotropic medications, informed consent of youth, and compliance with professional practice guidelines.

*Id.* § 622(b)(15)(A)(v).

Additionally, "[t]he federal government requires that states provide information in their Annual Progress and Services Report submissions on":

> [T]he protocols used to monitor the appropriate use of psychotropic medications for children and youth in the foster care system. States must support their choice of protocols and provide additional information on how the child welfare workforce and providers are trained on the appropriate use of psychotropic medications. The State's protocol must address:

• Comprehensive and coordinated screening, assessment, and treatment planning mechanisms to identify children's mental health and trauma-treatment needs (including a psychiatric evaluation, as necessary, to identify needs for psychotropic medication);

• Informed and shared decision-making (consent and assent) and methods for ongoing communication between the prescriber, the child, his/her caregivers, other healthcare providers, the child welfare worker, and other key stakeholders;

• Effective medication monitoring at both the client and agency level;

• Availability of mental health expertise and consultation regarding both consent and monitoring issues by a board-certified or board-eligible Child and Adolescent Psychiatrist (at both the agency and individual case level); and

• Mechanisms for sharing accurate and up-to-date information related to psychotropics to clinicians, child welfare staff, and consumers. This should include both data sharing mechanisms (e.g., integrated information systems) and methods for sharing educational materials.

(ECF No. 75 ¶ 101.)

Also, as discussed at greater length below, "[t]he case plan and case review system requirements of the [AACWA], under Title IV-E of the Social Security Act, require child welfare agencies to maintain and share up-to-date health records as part of a written case plan for every child in custody." (ECF No. 75 ¶ 116, citing 42 U.S.C. §§ 675(1)(C), (5)(D)).

### 3.  *Policy SSA - CW# 15-8*

Effective October 14, 2014, SSA issued Policy SSA-CW# 15-8 (the "Psychotropic Policy"), which "establishes guidelines to ensure proper oversight and monitoring of psychotropic

medication that is prescribed to children and youth in out-of-home care."[3]  (ECF No. 75 ¶ 113.)

The Psychotropic Policy provides:

> The administration of psychotropic medications to youth is not an arbitrary decision and documented oversight is required to protect youth's health and well-being.
>
> Psychotropic medication must not be used as a method of discipline or control for any youth. Psychotropic medications are not to be used in lieu of or as substitute for identified psychosocial or behavioral interventions and supports required to meet a youth's mental health needs.
>
> .            .            .
>
> The Local Department of Social Services (LDSS) must have an informed consent for each psychotropic medication prescribed to a foster child. An informed consent is consent for treatment provided after an explanation [of] the proposed treatment, expected outcomes, side effects and risk is provided by the prescribing clinician. The DHR 631-IC, Psychotropic Medication Informed Consent form (See Appendix I), must be used to document the requirements. In efforts to assist with getting the prescribing clinician to complete the informed consent, a sample letter explaining to the prescriber the need for an informed consent can be found in Appendix II of this policy. The letter can be presented to the prescriber prior to the appointment or at the time of the appointment.[4]

*Id.* ¶¶ 114, 137.  For children 16 years of age and older, it provides for their assent to the medication, consistent with Maryland law.[5]  *See* MD. CODE ANN., HEALTH-GEN. § 20-104(b)(2) (providing that children under the age of 16 do not have capacity to "consent to the use of prescription medications to treat a mental or emotional disorder").

---

[3] SOC. SERVS. ADMIN., *SSA - CW# 15-8 Policy Directive* (2014), https://dhs.maryland.gov/blog/wp-content/uploads/2012/10/SSA-15-08-Oversight-and-Monitoring-Psychotropic-Medications.pdf [https://perma.cc/GLK4-QZQM]. *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (noting that courts "routinely take judicial notice of information contained on state and federal government websites").
[4] *Id.* at pp. 3–4.
[5] *Id.* at p. 5.

Without restating the Psychotropic Policy in full, the court notes that it generally includes, relevant here: restrictions on who can prescribe psychotropic medications; requirements that must be met before prescribing psychotropic medications—including a current physical and baseline laboratory framework, a DSM-5 diagnosis of a mental health disorder, and an explanation of the purpose for and effect of the medication consistent with an individual's ability to understand; requirements for when LDSS may provide consent and what communications must occur with the child's parent or legal guardian; the caseworker's obligation to review medication adherence and effects, ensure compliance with medical appointments (including that laboratory work occur on a routine basis), and discuss the medication with the child (including any benefits or side effects); necessary documentation for children who are prescribed psychotropic medications, including noting relevant information in the child's "Health Passport" (comprehensive medical records of a child in foster care, discussed at greater length below), the child's comments and concerns regarding the medication, and any feedback from the birthparents and others; and that informed consent be obtained "once a year, when a new medication is started[,] and/ or when dosage exceeds the maximum indicated dosage range."[6]

## B.  Administration of Psychotropic Medications to Children

Plaintiffs allege that the State's failures in oversight as to the administration of psychotropic medication to children in its legal custody deviate from any accepted professional judgment and constitute deliberate indifference to harm or substantial risk of serious harm to Plaintiffs and the putative class, and subject Plaintiffs and the putative class to unnecessary administration of psychotropic medication.  (ECF No. 75 ¶¶ 160, 164.)

---

[6] *Id.* at pp. 2–7.

Relying on child medical professional association sources, Plaintiffs make extensive allegations regarding the risks and problems associated with psychotropic medication use in children, especially in the foster care system, such as "serious short- and long-term adverse effects," *see* ECF No. 75 ¶ 71, "seizures, irreversible movement disorders, suicidal thinking and behavior, mood disruption, irritability and restlessness, weight gain, diabetes and metabolic abnormalities, nausea and vomiting, blurred vision, excessive fatigue, somnolence, tremors, anorexia, severe liver disease, adverse cardiovascular and respiratory effects, and unexpected death, among other life-threatening conditions," *see id.* ¶ 72, and that psychotropic medications are prescribed to children as "off-label" because they have not "been proven safe or effective in children," *id.* ¶ 75. Plaintiffs further allege that prescription of psychotropic medication to children is especially concerning where the prescriptions are "too many," where the dosage is "too much," and where the child is "too young." *Id.* ¶ 77. Plaintiffs also make allegations as to the potential serious risks and harms associated with same, as well as a lack of research-based guidelines or support. *Id.* ¶¶ 78–94.

"Foster care's instability exacerbates the risks associated with the use of psychotropic medications." (ECF No. 75 ¶ 6.) The U.S. Department of Health and Human Services' Office of Inspector General has identified that "children in foster care may be at risk for inappropriate prescribing practices (e.g., too many medications, incorrect dosage, incorrect duration, incorrect indications for use, or inappropriate treatment)." *Id.*

These issues are particularly prominent in Maryland. "As many as 34% of children in Maryland foster care statewide are administered psychotropic drugs, as compared to 8% of Medicaid-eligible children nationally who are not in foster care." (ECF No. 75 ¶ 8.) Further, "53.68% of Maryland foster children who are taking psychotropic drugs are prescribed multiple

drugs at the same time, which is a potentially dangerous practice known as polypharmacy." *Id.*

"[A]t least 72.1% of children in Maryland foster care who are taking psychotropic drugs do not

have a documented psychiatric diagnosis." *Id.* ¶ 9. Finally, over the course of one year (between

June 2020 and July 2021), "at most 25.26% of children in foster care in Maryland who were taking

psychotropic drugs had received a mental health examination." *Id.* ¶ 145.

### C. Alleged Failures of the State's Oversight of Prescription of Psychotropic Medication to Children in Maryland Foster Care

Plaintiffs identify several alleged issues with the State's administration of psychotropic

medications to children in the foster care system and in its legal custody. While the State has

"recognized the serious risks of harm associated with the administration of psychotropic

medications to children in foster care" and "acknowledged [its] duty to maintain oversight

mechanisms to protect against these risks," it has failed to implement an adequate oversight system

and "continue[s] to allow hundreds of children in foster care to be administered one or more

potentially dangerous psychotropic drugs without exercising minimally adequate oversight."

(ECF No. 75 ¶¶ 7–8.) Plaintiffs complain of three general practices: (i) the State's failure "to

compile and maintain minimally-comprehensive and up-to-date medical and mental health records

for all children in foster care," (ii) the State's failure "to maintain and implement an adequate

informed consent process in which a designated individual consults with a prescriber regarding the

drug's anticipated benefits and risks and provides consent for the prescription of one or more

psychotropic drugs," and (iii) the State's failure "to operate an adequate secondary review system

to assure that 'outlier' prescriptions of psychotropic medications to children are immediately

flagged for purposes of obtaining a second opinion from a child psychiatrist." *Id.* ¶ 10.

Plaintiffs also allege that the State is well aware of the issues with administering

psychotropic medication to children in Maryland foster care, referencing its reported

disproportionate rates of use, its stated concerns about "high dosing, polypharmacy, treatment of young children (including psychotropic medication treatment of youth <1 year old), and inadequate oversight," its admission that DHS "has struggled to accurately capture data to reflect the overall mental health needs of children and youth in care in the electronic data system," that the State's "Health Passport" system has "poor readability and poor completion rates," and a report from the Maryland Citizen's Review Board for Children, which revealed that only 41% of sampled children had medical records in their case files.  (ECF No. 75 ¶¶ 104–112, 127–28, 130.)

### 1.  The State's Alleged Failure to Maintain Complete and Current Health Records

At issue here, a Health Passport is "DHS's mechanism for providing health information to foster families and health care professionals."  (ECF No. 75 ¶ 128.)  The State requires a Health Passport "be delivered to a foster caregiver or other placement provider at the time of a child's placement in their care."  *Id.* ¶ 122.  "The Health Passport must contain historical and current medical information and should be accessible by the caretaker, physicians, and LDSS in order to identify and meet the child's health needs."  *Id.*  Further, where children have been prescribed psychotropic medications, the Health Passport must include:

> • Mental Health Diagnosis;
> • Name of prescribed psychotropic medications, dosage, and prescribing clinician's name and medical specialty;
> • Routine medication monitoring appointments with prescribing physician;
> • If applicable, ongoing testing/lab work specific for the prescribed medication;
> • Any potential side-effects; and
> • All non-pharmacological treatment services (i.e. therapy, behavioral supports/monitoring, and other interventions).
>
> .                 .                 .
>
> • The youth's physical reaction to the medication;
> • The youth's comments and/or concerns regarding the medication;

> • The caregiver's observations and comments regarding the effects
> of the medication;
> • Feedback regarding the medication's effect on the child from birth
> parent(s), therapist, daycare providers, teachers, and/or other
> persons as applicable; and
> • All feedback (oral and written) from the prescribing clinician.

*Id.* ¶¶ 122–23.

Plaintiffs allege that, "[n]otwithstanding federal law and policy directives, as well as Maryland's own policy directives, [the State] fail[s] to maintain comprehensive and current health records for children placed in their custody," and "fail[s] to provide caregivers with complete and up-to-date health information at the time a child is placed in their foster home or in another placement in a routine and consistent manner." *Id.* ¶ 125. Important here, the failure "to collect, maintain, and provide foster caretakers with complete and accurate health records places children [in Maryland foster care] who have been prescribed psychotropic medications" at unreasonable risk of serious harm. *Id.* ¶ 132. "Without a system to ensure that foster caregivers are consistently provided this critical health information, caretakers are often left to conduct their own research, with little guidance as to when and how to administer the medications, potential risks and adverse effects, and how to respond when a child experiences adverse side effects." *Id.* ¶ 133.

### 2. The State's Alleged Failure to Assure an Adequate Informed Consent Process

When a child is in the legal custody of the State (through Maryland foster care), the State must "establish a policy that designates an individual with the authority to provide informed consent for the child in state custody and a process for assuring that meaningful consent occurs." (ECF No. 75 ¶ 134.) As discussed above, the Psychotropic Policy requires informed consent for prescription of psychotropic medications. *Id.* ¶ 137. Plaintiffs allege the Psychotropic Policy is constitutionally deficient due to its:

Failure to assure that an adequate process is undertaken to meaningfully engage biological parents/legal guardians in informed consent decision-making in relation to the administration of psychotropic medications to children, including the absence of adequate definition in state policy regarding the circumstances in which a parent or guardian is considered "unavailable" or "unwilling" to provide consent;

Failure to require that children and youth possessing adequate mental capacity to make psychotropic medication treatment decisions are engaged in the informed consent process, including the absence of policy language addressing the capacity of children below the age of 16 to form an informed decision whether to assent to a psychotropic medication and the process to be undertaken to determine the child's capacity;

Failure to require that an independent, secondary review by a child psychiatrist occurs in relation to the prescription and administration of higher risk psychotropic medications and combinations of psychotropic medications to children, including the absence of policy language providing for an independent review process and identifying those outlier or clinically suspect prescriptions that trigger the need for a mandatory secondary review;

Failure to require that the person designated by the State to undertake the informed consent role on behalf of a child is sufficiently knowledgeable regarding the child's medical and mental health history, including the absence of policy language requiring the person assigned informed consent authority (the LDSS Director or Assistant Director) to review pertinent medical and mental health records and to interview knowledgeable individuals (such as the child's caseworker, the supervisor, and the child's assigned foster parent(s)) in preparation for making the informed consent decision;

Failure to require that informed consent for the administration of psychotropic medications to children is valid only for a set duration; and

Failure to assure that informed consent for the administration of psychotropic medications to children is conditioned on the timely completion of laboratory testing and follow-up medical care.

*Id.* ¶ 138.  Further exacerbating these issues, "[i]n practice, there is no formal process for youth to raise concerns with prescribed medications."  *Id.* ¶ 142.

The State's "failure to institute constitutionally adequate informed consent policies, as well as [its]  failure to ensure existing policies are being complied with, results in children being administered psychotropic drugs without proper informed consent, which places children at an unreasonable risk of harm." (ECF No. 75 ¶ 140.)  Plaintiffs allege that this failure is all the more concerning given the failures to maintain complete and updated medical records: "The lack of comprehensive and up-to-date health records for all children in foster care materially impedes the informed consent process. Consent may be provided without the benefit of knowing a child's health history, which could include medication allergies, documented adverse side effects to medications, or failed previous attempts with respect to the very same drug." *Id.* ¶ 147.

### 3. *The State's Alleged Failure to Operate an Oversight System to Flag for Secondary Review*

Medical professionals recommend that child welfare agencies "implement a secondary review system to detect and assess outlier or otherwise concerning prescriptions of psychotropic medications to children in state custody." (ECF No. 75 ¶ 149.)  Such a process would "employ[] independent child psychiatrists to conduct second opinion evaluations of the therapeutic recommendations made by initial prescribers when specific triggering circumstances occur, including but not limited to 'too many,' 'too much,' and 'too young' prescribing practices." *Id.* The State has "long recognized that for children prescribed psychotropic medication in Maryland, certain criteria should trigger further review of the child's clinical status," yet it "fail[s] to operate a monitoring and oversight system that adequately flags for secondary review outlier prescriptions of psychotropic medications for children in their care." *Id.* ¶¶ 153, 155.  While it does have a "Peer Review Program for Mental Health Medications," this program only reviews a subset of psychotropic medications and is "so lenient that even [that subset of psychotropic medications] go[es] largely unreviewed." *Id.* ¶¶ 155–56.

### D.  Named Plaintiffs

#### 1.  B.F.

B.F. (now about 17 years old) first entered foster care in or around May 2018.  (ECF No. 75 ¶ 18.)  At that time, he was taking three psychotropic medications.  *Id.*  Less than two years later, he was administered six psychotropic medications, which caused B.F. to experience "escalating behavioral issues." *Id.* There was no secondary review of the effect of these concurrent medications and his behavior continued to escalate while on the psychotropic medications. *Id.* ¶ 19.  While in a residential treatment facility, B.F.'s medication regime was again changed, and he was administered seven psychotropic medications.  *Id.* ¶ 20.  He subsequently "experienced increasingly emotional outbursts and aggression." *Id.* ¶ 21.  Again, no "secondary review or effective secondary review of his medications" took place.  *Id.* ¶ 22.

"B.F. attended his psychiatry appointments at the residential treatment center alone; no adult with authority to consent to his medications attended these appointments with him to review medication options." *Id.* ¶ 23.  B.F. did not have "adequate conversations with his treating physicians explaining his medications and seeking his assent." *Id.* ¶ 25.  Following release from the residential treatment facility and trial placement with his birth mother, B.F. was placed at a respite foster home; his foster caregiver "has not received his current Health Passport from DHS." *Id.* ¶ 26.  B.F. remains in DHS's legal custody.  *Id.*

Ultimately, Plaintiffs allege:

> Over the six years that B.F. has been in Maryland's foster care custody, DHS has failed in its obligation to provide for his safety and well-being with respect to how psychotropic medications are administered to him. DHS has allowed B.F. to be placed on up to six psychotropic drugs at once and failed to provide appropriate oversight mechanisms of B.F.'s psychotropic medications. As a result, he has been harmed and put at further risk of harm.

*Id.* ¶ 15.

### 2. *Y.C.*

Y.C. (now about 13 years old) first entered state care in 2014. (ECF No. 75 ¶ 30.) Y.C. is currently prescribed at least three psychotropic medications, as well as two additional medications for agitation and insomnia. *Id.* ¶ 31. During his time in foster care, Y.C. has been prescribed six additional psychotropic medications. *Id.* "[T]here has been no secondary review or effective secondary review of his medications." *Id.* ¶ 35. Y.C. has experienced severe side effects as a result of his psychotropic medications, including dramatic weight gain, a prediabetes diagnosis, lethargy, drowsiness, drooling, and muscle stiffness. *Id.* ¶ 35.

"Since being placed in foster care, Y.C. has cycled between hospitalizations, foster family homes, and residential treatment facilities." (ECF No. 75 ¶ 32.) "Between placements, there has been little continuity in the oversight of his psychotropic medications." *Id.* Contrary to the Psychotropic Policy, Y.C.'s caseworker has been the person to provide regular consent for his psychotropic medications. *Id.* ¶ 33. "At times, no adult with authority to consent to his medications attends Y.C.'s psychiatric appointments with him." *Id.* ¶ 34. "At one recent treatment meeting, Y.C.'s caseworker was not in attendance and though the team discussed increasing the dosage of his medication Clonidine, Y.C.'s treating psychiatrist did not know who could be approached for consent for the proposed change." *Id.* Despite efforts to do so, Y.C.'s representatives "have not been able to secure a comprehensive medical history from his case file with [DHS]." *Id.* ¶ 36. Y.C. remains in DHS's legal custody. *Id.* ¶ 32.

Ultimately, Plaintiffs allege:

> Over the significant time Y.C. has spent in Maryland's foster care custody, Defendants have failed in their obligation to provide for his safety and well-being with respect to how psychotropic medications are administered to him. Defendants have allowed Y.C. to be placed

on at least four psychotropic drugs at once and failed to provide
appropriate oversight mechanisms to assure the safe and appropriate
use of Y.C.'s psychotropic medications. As a result, he has been
harmed and put at further risk of harm.

(ECF No. 75 ¶ 30.)

### 3. *Y.D.*

Y.D. (now about seven years old) first entered state care in 2024. (ECF No. 75 ¶ 40.) Y.D. is currently prescribed multiple psychotropic medications. *Id.* ¶ 41. "[T]here has been no secondary review or effective secondary review of her medications." *Id.* ¶ 43. Y.D. has experienced severe side effects as a result of her psychotropic medications, including appetite and weight loss. *Id.* ¶ 42. Further, since starting these medications, Y.D. has become "withdrawn and quiet," with her Court-Appointed Special Advocate ("CASA") describing her as "like a zombie," and her current foster caretaker (Ms. Emely) describing her as an "empty shell." *Id.* ¶ 43. Notwithstanding these side effects, "the dosages of her medications were repeatedly increased." *Id.* ¶ 42.

"No adult with authority to consent to her medications regularly attends Y.D.'s psychiatric appointments with her." *Id.* ¶ 44. Further, contrary to the Psychotropic Policy, Y.D.'s caseworker has been the person to provide regular consent for his psychotropic medications. *Id.* When Y.D. was moved to her current foster care placement on February 7, 2025, DHS "brought a small supply of Y.D.'s medication, but did not include any information about the medications or instructions for how and when Ms. Emely should administer them to Y.D." *Id.* ¶ 45. Further, DHS "did not ensure that Y.D.'s Health Passport, containing historical and current medical information to identify and meet the child's health needs, was delivered to her new foster family placement at the time of her move in February 2025." *Id.* ¶ 46. "As of March 13, 2025, over one month after her

move, the Health Passport had still not been delivered." *Id.* Y.D. remains in DHS's legal custody. *Id.* ¶ 47.

Ultimately, Plaintiffs allege:

> Defendants have failed in their obligation to provide for her safety and well-being with respect to how psychotropic medications are administered to her, and failed to provide appropriate oversight mechanisms to assure the safe and appropriate use of Y.D.'s psychotropic medications. As a result, she has been harmed and put at further risk of harm.

(ECF No. 75 ¶ 40.)

### E.  Relevant Procedural History

On January 17, 2023, Plaintiffs initiated this action.  Following amendment of the pleadings, the now-operative Class Action Amended Complaint for Injunctive and Declaratory Relief at ECF No. 75 (the "Amended Complaint") asserts three counts against Defendants:

> Count I: Violation of Plaintiffs' and Putative Class Members' Substantive Due Process Rights under the U.S. Constitution;
>
> Count II: Violation of Plaintiffs' and Putative Class Members' Procedural Due Process Rights under the U.S. Constitution;
>
> Count III: Violation of Plaintiffs' and Putative Class Members' Rights under the AACWA, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*

(ECF No. 75 ¶¶ 158–73.)  Plaintiffs seek declaratory and injunctive relief, an award of reasonable attorneys' fees and costs, and other relief the court finds "necessary or appropriate in the interests of justice." *Id.* ¶ 174.

Following an extended stay of this action while the parties attempted settlement, on April 24, 2025, the State filed its Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that Plaintiffs lack standing and that all of Plaintiffs' claims fail to state a claim.   (ECF No. 78.)

II.    **LEGAL STANDARD**

   **A.  Federal Rule of Civil Procedure 12(b)(1)**

   "Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). Subject matter jurisdiction challenges may proceed as "either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).

   In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see Ministry of Defence of State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir. 2024) (same).   Conversely, in a factual challenge, "the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018) (same). "In that circumstance, the court 'may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)).

   "Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). "The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of

18

the evidence." *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 176 (D. Md. 2019) (citing *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999)). "In determining whether jurisdiction exists, 'the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue.'" *Id.* at 176 (quoting *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003)).

Subject matter jurisdiction challenges may proceed in two ways: "either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see Ministry of Defence of State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir. 2024) (same). Conversely, in a factual challenge, "the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192. "In that circumstance, the court 'may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)). The State here asserts a facial challenge to the court's subject matter jurisdiction, averring that Plaintiffs lack standing to bring this action and seek the requested relief. (ECF No. 78-1 at pp. 12–17.)

### B. Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *as amended* (Jan. 20, 2017) (quoting *Papasan v. Allain*, 478 U.S. 265, 283 (1986)).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that 'the defendant is liable for the misconduct alleged.'" *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level, thereby nudging its claims across the line from conceivable to plausible." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (citation modified) (quoting *Twombly,* 550 U.S. at 555, 570).  The plausibility requirement is not "a probability requirement but rather a mandate that a plaintiff 'demonstrate more than a sheer possibility that a defendant has acted unlawfully." *In re Birmingham*, 846 F.3d at 92 (quoting *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)).  Reliance on "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient.  *Twombly*, 550 U.S. at 555.

## III.  <u>ANALYSIS</u>

### A. Standing

The Constitution extends the judicial power of Article III courts to "cases" or "controversies."  U.S. CONST. ART. III, § 2, cl. 1.  The doctrine of standing, among others,

"implements" this limit. *Carney v. Adams*, 592 U.S. 53, 58 (2020). "Article III standing is 'part and parcel of the constitutional mandate that the judicial power of the United States extend only to cases and 'controversies.'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). To establish standing:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't. of Educ v. Brown*, 600 U.S. 551, 561 (2023) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs bear the burden to establish their standing. *Lujan*, 504 U.S. at 561.

Relevant here, the State challenges Plaintiffs' satisfaction of the first and third elements of standing—what courts often refer to as "injury in fact" and "redressability."[7] (ECF No. 78-1 at pp. 13–17.) First, the State contends that Plaintiffs' allegations that they have been exposed to "insufficient government policies and procedures" do not support a showing of a concrete injury in fact. *Id.* at pp. 13–15. Second, the State asserts that Plaintiffs fail to plead redressability because they seek relief from third parties and relief outside of the court's authority to provide. *Id.* at pp. 15–17.

---

[7] The State's arguments as to redressability overlap in some part with traceability or causation. Further, although not expressly argued in the State's Motion, it asserts in reply that Plaintiffs fail to plead causation under the standing analysis. (ECF No. 86 at p. 5.) Ultimately, the State's argument as to causation is redundant of its argument as to injury in fact because it rests on the assertion that "if no concrete injuries have been alleged, Defendants have not caused any injuries." *Id.* Because the court rejects the State's argument as to Plaintiffs' asserted injury, its argument as to causation is similarly not persuasive.

## 1.  *Injury in Fact*

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* A concrete injury is one that is "'real,' and not 'abstract.'" *Id.* at 340. Such injury "can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Because "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy' for purposes of equitable relief," "[p]rospective relief must instead be justified by prospective injury." *State of Maryland v. United States Dep't of Agric.*, 151 F.4th 197, 209 (4th Cir. 2025) (first quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974); then quoting *All. for Hippocratic Med.*, 602 U.S. at 381). Accordingly, "when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *All. for Hippocratic Med.*, 602 U.S. at 381 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citations omitted) (citing *Clapper*, 568 U.S. at 414 n.5 (2013)). A theory of standing that "relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

Citing *Lewis v. Casey*, 518 U.S. 343 (1996), the State urges that Plaintiffs allegations of harm and threatened harm are insufficient because, the State contends, Plaintiffs merely allege

"exposure to insufficient government policies and procedures."   In *Lewis*, the Supreme Court

opined:

> It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. In the context of the present case: It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur. Of course, the two roles briefly and partially coincide when a court, in granting relief against actual harm that has been suffered, or that will imminently be suffered, by a particular individual or class of individuals, orders the alteration of an institutional organization or procedure that causes the harm. But the distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly.

*Id.* at 349–50.

As an example of these limits, the Court offered the following:

> If—to take another example from prison life—a healthy inmate who had suffered no deprivation of needed medical treatment were able to claim violation of his constitutional right to medical care, see *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), simply on the ground that the prison medical facilities were inadequate, the essential distinction between judge and executive would have disappeared: it would have become the function of the courts to assure adequate medical care in prisons.

*Id.* at 350.   The State urges that where Plaintiffs do not allege that "they were forced to take

unwanted or unnecessary medications," their claim of injury rests on exposure to "insufficient

government policies and procedures."  (ECF No. 78-1 at pp. 13–14.)  The court disagrees.

Plaintiffs do not allege circumstances where they merely exist in the State's custody and

that the State's systems are inadequate.  Instead, Plaintiffs allege they (and putative class members)

are minor children in the foster care system that have been prescribed psychotropic medications without regard for well-known associated risks, and have experienced (and are at serious risk of) harm as a result—in the form of medical, behavioral, psychological, and emotional deleterious effects.[8]  They allege the serious and concrete effects of polypharmacy, high dosages, and prescriptions for young children, as well as the specific failures of the State in overseeing same. Moreover, Plaintiffs allege that the State's lack of oversight subjects Plaintiffs to serious risk of unnecessary administration of psychotropic medications.  Plaintiffs further plausibly allege that these actions and inactions have harmed them and pose a substantial risk of future harm, including the medical, behavioral, psychological, and emotional impacts noted above.  Plaintiffs' theory is not conjectural or speculative; it is concrete.

Plaintiffs' asserted injuries do not present a circumstance, as in *Lewis*, where their injuries are based on mere and generalized exposure.  Unlike the facts of *Lewis*, Plaintiffs do not face a generalized risk.  They allege exposure, and imminent vulnerability, to the alleged defects in the State's specific processes intended to address (*i.e.*, avoid or counter) these issues.  Further, their claim of substantial risk of serious harm is not based on speculation; Plaintiffs allegations include the many specific risks attendant to psychotropic medications, the frequency with which the State

---

[8] The State seems to argue that side effects of unnecessary or unconsented to prescription of psychotropic medications cannot constitute an injury to Plaintiffs or support a serious risk of substantial harm based on the Supreme Court's discussion of medication side effects in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).  (ECF No. 78-1 at p. 15.)  In *Alliance for Hippocratic Medicine*, the Supreme Court considered whether doctors could demonstrate injury in fact and causation based on their assertion of "diverting resources and time from other patients to treat patients with [the medication's] complications." *Id.* at 390.  The Court found that the "chain of causation was too attenuated," explaining "doctors have never had standing to challenge FDA's drug approvals simply on the theory that use of the drugs by others may cause more visits to doctors." *Id.* at 392.  Where Plaintiffs here allege direct harm from unnecessary and unconsented to administration of psychotropic medications, without proper oversight, the State's reliance on *Alliance for Hippocratic Medicine* is not persuasive. *See also* ECF No. 84 at p. 6, n.3, Plaintiffs' contention that the State "misses the point" in urging that side effects from "medically appropriate, voluntarily consumed medications are inherent in the use of any medication," because the entire thrust of the Amended Complaint is that psychotropic drugs are not like "any medication" and require monitoring given their extreme, sometimes irreversible, side effects.  The court agrees that the State attempts to talk past this important point.

allows children within its custody to be administered these medications, and the multi-faceted inadequacy of the State's oversight processes.

The court is satisfied that Plaintiffs plausibly and adequately allege injury in support of their standing.

### 2. *Traceability and Redressability / Third Parties*

The traceability element "ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court."[9] *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025) (quoting *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002)).  While "the injury complained of" cannot be "the result of the *independent* action of some third party not before the court,'" *see Bennett v. Spear*, 520 U.S. 154, 169 (1997) (emphasis in original) (citation modified) (quoting *Lujan*, 504 U.S. at 560–61), this element "does not require the challenged action to be the sole or even immediate cause of the injury."  *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018).  Where "multiple actors are involved," a plaintiff may show injury is traceable to the defendant's conduct "if the defendant's conduct had a 'determinative or coercive effect upon the action of someone else.'"  *Sheppheard*, 143 F.4th at 243 (quoting *Bennett*, 520 U.S. at 169).  *See also Lowy v. Daniel Def., LLC*, 167 F.4th 175, 195 (4th Cir. 2026) (opining that the district court "incorrectly believed that the plaintiffs could satisfy the second *Lujan* element (i.e., Article III causation) only if they had demonstrated that the defendants' conduct had a 'determinative or coercive effect' on the actions" of another).  The Fourth Circuit recently reiterated that a plaintiff's burden as it relates to traceability is fairly modest.  *See Lowy*, 167 F.4th

---

[9] While the State characterizes its challenge as solely to redressability, the court finds the analysis overlaps with questions of traceability/causation and thus considers both here. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (describing "causation and redressability" as "often flip sides of the same coin") (citation omitted).

175 (noting at the motion to dismiss stage that the standing requirements are "relatively modest," and that is "particularly so as it relates to traceability").

The State's argument that the requested relief overlaps with the actions of third parties is not compelling.  First, its argument neglects Plaintiffs' allegations and their requested relief; all are tailored to the State's specific oversight deficiencies as to their care in the prescription of psychotropic medications, not the actions of third parties.  That third parties may be involved in these processes, and that the State's failings may not be the "sole or even immediate cause of injury" is not determinative.  *Sierra Club*, 899 F.3d at 284.  Plaintiffs "need not show that a favorable decision will relieve [their] every injury," but rather that they "personally would benefit in a tangible way from the court's intervention."  *Id.* (first quoting *Larson v. Valente*, 456 U.S. 228, 242–44 & n.15 (1982); then quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000)).

Plaintiffs allege the State's policies and practices with regard to inadequate and incomplete medical records, inadequate informed consent, and inadequate review of the psychotropic medications provided to children in its care.  As referenced above, while third parties may also be involved in these processes, it does not follow that Plaintiffs may not challenge the State's actions in its oversight of these processes.  *See Doe 4 by & through Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 985 F.3d 327, 336 (4th Cir. 2021) (explaining that, even where another entity was involved in the authority over mental health care for the children at issue, appellants sought relief "likely to redress their injuries" where they "allege that they have suffered physical and mental harm from the Commission's failure to provide adequate mental health care" and sought "declaratory and injunctive relief to require the Commission to implement a 'trauma-informed' standard of care in its facility").

26

The court is persuaded that Plaintiffs plausibly and adequately allege their claims, including that they seek relief from, and related to, actions of the State, not third parties.

### 3. Redressability / Requested Relief

Finally, the court is not persuaded by the State's standing challenge as to the specific relief sought.  The redressability element of standing "ensures that the court has the power to grant the plaintiff's requested relief, and that such relief would remedy the plaintiff's injury."  *Sheppheard*, 143 F.4th at 243 (citing *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020)).  It is well-recognized that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (first citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); then citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).  "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered."  *California v. Texas*, 593 U.S. 659, 671 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).  A plaintiff "must show that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (quoting *Friends of the Earth*, 528 U.S. at 181).

Plaintiffs seek declaratory and targeted injunctive relief to address the alleged violations in the Amended Complaint; this includes declaratory relief that the State's failures in oversight violate substantive and procedural due process, and that its failure to maintain medical records and deliver same to foster caregivers violates the AACWA; and injunctive relief to enjoin the State from continuing to subject Plaintiffs and the putative class to these failures.  (ECF No. 75 ¶ 174.)

The State urges that Plaintiffs' requested relief "would improperly interfere with DHS' operation and transform the Court into its overseer." (ECF No. 78-1 at p. 16.)

As an initial matter, the State does not challenge the court's authority to declare actions unlawful or to award broad injunctive relief (as a general proposition). *See Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) ("The Judiciary Act of 1789 endowed federal courts with jurisdiction over "all suits . . . in equity," § 11, 1 Stat. 78, and still today, this statute "is what authorizes the federal courts to issue equitable remedies," S. Bray & E. Sherwin, Remedies 442 (4th ed. 2024)."); *see* FED. R. CIV. P. 57; 28 U.S.C. § 2201. Accordingly, the court is persuaded that Plaintiffs seek relief the court has the authority to provide—declaratory and injunctive relief—and that such relief would redress the alleged injuries. *See Sheppheard*, 143 F.4th at 243, *supra*.

Further, the requested relief is not, as the State suggests, an overhaul of its foster care system; instead, the relief requested is tailored to the specific challenged policies and practices, and the specific constitutional violations alleged. To be sure, the court cannot, as the State notes, "shape the institutions of government," *see Lewis*, 518 U.S. at 349, or "take over the foster care system" in Maryland, *see Jonathan R. v. Morrisey*, 768 F. Supp. 3d 756, 759 (S.D.W. Va. 2025). (ECF No. 78-1 at p. 16.) But the court is not persuaded at this juncture that Plaintiffs seek such relief here.[10] And, as for Plaintiffs' request for injunctive relief to establish certain policies to ensure due process, such relief is not outside the court's authority, and the court acknowledges any such relief must be narrowly tailored. Further, as Plaintiffs note, the Fourth Circuit has found the

---

[10] The court notes the State's reliance on the recent decision in *Jonathan R. v. Morrisey*, 768 F. Supp. 3d 756 (S.D.W. Va. 2025). Review of the relief sought in *Jonathan R.* shows material differences with the relief sought here; for instance, plaintiffs there sought an order that defendants "contract with an appropriate outside entity to complete a needs assessment" and "appoint[ment of] a neutral Monitor, paid for by the Defendants, to monitor the terms of [the order]." *Id.* at 762. As Plaintiffs note, the relief here is considerably more narrowly tailored. (ECF No. 84 at p. 14 n.9.) In any event, *Jonathan R* is not binding on this court, and this court respectfully disagrees for the reasons set forth above. *Cf. Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 929 n.28 (2018) (recognizing the principle that "when a federal or state law violates the Constitution, the American doctrine of judicial review requires us to enforce the Constitution").

redressability element was met where the plaintiffs sought "declaratory and injunctive relief to require the Commission to implement a 'trauma-informed' standard of care in its facility." *See Doe 4 by & through Lopez*, 985 F.3d at 336.

In any event, even were Plaintiffs unable to show entitlement to certain forms of injunctive relief sought (or that such relief is an appropriate remedy of this court), it does not follow that they then lack standing *en toto*. That Plaintiffs may not ultimately prove an entitlement to every aspect of relief sought does not diminish this court's authority to issue declaratory and injunctive relief as against the State tailored to the complained-of acts.

Accordingly, on the record before the court, Plaintiffs sufficiently plead each element of standing. The court will deny the Motion pursuant to Rule 12(b)(1) for lack of standing.

The court now turns to the State's arguments under Rule 12(b)(6).

## B. Counts I and II: Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV § 1. "[T]he touchstone of due process is protection of the individual against arbitrary action of government," whether "the fault lies in a denial of fundamental procedural fairness, . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974) and citing cases).

The Due Process Clause, however, "does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm." *Evans v. Chalmers*, 703 F.3d 636, 647 n.2 (4th Cir. 2012). "In order to claim entitlement to the protections of the due process clause—either substantive or procedural—a plaintiff must first show that he has a constitutionally protected

Case 1:23-cv-00109-JRR   Document 95   Filed 03/12/26   Page 30 of 54


'liberty' or 'property' interest, and that he has been deprived of that protected interest by some form of state action." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988) (citations omitted)); *see Bailey-El v. Housing Authority of Balt. City*, 686 F. App'x 228, 229 (4th Cir. 2017) ("[T]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty."). "Unless there has been a 'deprivation' by 'state action,' the question of what process is required and whether any provided could be adequate in the particular factual context is irrelevant, for the constitutional right to 'due process' is simply not implicated." *Stone*, 855 F.2d at 172.

At issue here, there can be no doubt that Plaintiffs have a protected liberty interest in avoiding unwarranted, unwanted, or unconsented to, administration of psychotropic medication. *See Washington v. Harper*, 494 U.S. 210, 221–22 (1990); *see Farabee v. Yaratha*, 801 F. App'x 97, 108 (4th Cir. 2020) (citing cases); *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (discussing same) (*Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990)). The Supreme Court long ago recognized:

> Respondent's interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial. The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. Cf. *Winston v. Lee,* 470 U.S. 753, 105 S. Ct. 1611, 84 L.Ed.2d 662 (1985); *Schmerber v. California,* 384 U.S. 757, 772, 86 S. Ct. 1826, 1836–37, 16 L.Ed.2d 908 (1966). The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. See n. 1, *supra.* While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects.

*Washington*, 494 U.S. at 229.

Further, this court agrees with other district courts holding that this principle extends to children in state foster care subject to custodial care practices that pose substantial risks of harm

from unnecessary and unconsented to psychotropic medications.  *See, e.g., Bryan C. v. Lambrew*, 340 F.R.D. 501, 518 (D. Me. 2021); *M.B. by Eggemeyer v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 327767, at *11 (W.D. Mo. Jan. 8, 2018).  The State does not appear to challenge this precept, but nonetheless urges that Plaintiffs lack a liberty interest in "adequate oversight."  The State mistakes the point; the State's alleged lack of adequate oversight of children in its custody deprives them of adequate medical care and subjects them to serious risk of unnecessary and unconsented to psychotropic medications.  Plaintiffs plausibly allege a liberty interest.

### 1.  *Count I: Substantive Due Process Claim*[11]

The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1992)).  It provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997).  While the Due Process Clause generally "works only as a negative prohibition on state action," *see Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 170 (4th Cir. 2010) (quoting *Pinder v. Johnson,* 54 F.3d 1169, 1174 (4th Cir.1995)), "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989).

Relevant here, the Fourth Circuit has concluded that such duties arise when a State takes a child into its custody.  *Doe ex rel. Johnson*, 597 F.3d at 170–72.  "[W]hen a state involuntarily removes a child from her home, thereby taking the child into its custody and care, the state has

---

[11] In view of the court's analysis as to Plaintiffs' procedural due process claims, the court need not address the State's argument that existing procedures negate Plaintiffs' substantive due process claim.

taken an affirmative act to restrain the child's liberty, triggering the protections of the Due Process Clause and imposing 'some responsibility for [the child's] safety and general well-being. *Id.* at 171–72 (quoting *DeShaney,* 489 U.S. at 200). With the State's custodial role comes its duty not to act (or fail to act) in a manner that vitiates a "child's right to personal safety and security." *Id.* at 172.

The State urges that Plaintiffs do not plausibly allege a substantive due process claim because (1) Plaintiffs do not allege "that the State, through the affirmative exercise of its powers, involuntarily removed them from their home," (2) the State "owes no constitutional duty to facilitate informed consent or secondary medical opinions," and (3) Plaintiffs do not allege "conscious shocking conduct," but rather "mere policy violations or carelessness." (ECF No. 78-1 at pp. 29–37.)

The State's first argument—that Plaintiffs have failed to allege they were involuntarily removed from their homes—is unpersuasive. As Plaintiffs note, they allege that each Plaintiff (and putative class member) is "in the legal custody of DHS,"[12] *see* ECF No. 75 ¶¶ 26, 32, 47, which does not occur with voluntary placements, *see* ECF No. 78-1 at p. 3; MD. CODE ANN., FAM. LAW § 5-525(b)(2)(i), COMAR 07.02.11.03(B)(13).

Regarding the State's argument that it owes no duty to facilitate informed consent or provide secondary medical reviews, the State appears to misapprehend the relevant allegations. As discussed above, Plaintiffs allege that by failing to provide the requisite oversight, the State places Plaintiffs at serious risk of physical, emotional, and psychological harm. The court fails to see how such a risk does not bear on a child's "personal safety and security." *Doe ex rel. Johnson*,

---

[12] The State acknowledges that "[p]arents retain legal custody over a child who enters care voluntarily." (ECF No. 78-1 at p. 2, citing FL § 5-525(b)(2)(i) and COMAR 07.02.11.03(B)(13)).

597 F.3d at 175.  After explaining that the duty plainly applies to protect foster children's well-being, the Southern District of West Virginia in *Jonathan R. v. Justice* continued:

> The only issue here is whether this duty extends to protecting a foster child's *emotional* well-being. The Court believes it does. As another district court aptly put it, this "conclusion is grounded in common sense." *B.H. v. Johnson*, 715 F. Supp. 1387, 1395 (N.D. Ill. 1989). Children's physical and emotional well-being are equally important. *Id.* Although physical injuries mend, emotional trauma inflicted during a child's tender years has "an indelible effect" from which they may never recover. *Id.* It would be an odd result for the Fourteenth Amendment to require Defendants to protect against possible short-term injuries, while at the same time providing no protection against lifelong harm. This is hardly a novel idea, and the Court readily accepts it.

No. 3:19-CV-00710, 2023 WL 184960, at *7 (S.D.W. Va. Jan. 13, 2023).

This court agrees with *Jonathan R.* in this regard and with other courts similarly concluding that these oversight duties plausibly flow from a state's duty as to a child's right to safety and security.  *See, e.g.*, *Bryan C. v. Lambrew*, 340 F.R.D. 501, 517 (D. Me. 2021) (finding substantive due process claim plausibly alleged where plaintiffs "alleged that the Defendants are facilitating the administration of potentially harmful medications without consent or adequate medical justification and without ensuring sufficient oversight"); *M.B. by Eggemeyer v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 327767, at *7 (W.D. Mo. Jan. 8, 2018) (finding substantive due process claim plausibly alleged where plaintiffs "alleged that Defendants are aware that Missouri foster children are being administered psychotropic drugs without adequate oversight and therefore are subject to a serious risk of substantial harm").

The court turns finally to the State's argument that Plaintiffs do not allege "conscious shocking conduct," but rather "mere policy violations or carelessness."  (ECF No. 78-1 at pp. 29–37).  "To state a claim, a plaintiff must allege conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Swart v. Miyares*, 156 F.4th 435, 443

(4th Cir. 2025) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  "'Conduct intended to injure in some unjustifiable way' is 'most likely to rise to the conscience-shocking level,' while 'negligently inflicted harm is categorically beneath the threshold.'"  *Swart v. Miyares*, 156 F.4th 435, 443 (4th Cir. 2025) (citation modified) (quoting *Lewis*, 523 U.S. at 849).

"Depending on the circumstances of each case, however, 'different degrees of fault may rise to the level of conscience-shocking.'"  *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 574 (4th Cir. 2001)); *Paige v. Herring*, No. 20-6763, 2022 WL 337131, at *2 (4th Cir. Feb. 4, 2022) (discussing same).  The parties dispute the proper standard to be applied in assessing this prong of the substantive due process analysis— with Plaintiffs advocating for a professional judgment standard per *Youngberg v. Romeo*, 457 U.S. 307 (1982), and the State advocating for a deliberate indifference standard per *Doe ex rel. Johnson v. South Carolina Department of Social Services*, 597 F.3d 163 (4th Cir. 2010).[13]

The court agrees with Plaintiffs that the proper consideration here, in view of the Fourth Circuit's decision in *Doe 4 by & through Lopez v. Shenandoah Valley Juvenile Center Commission*, 985 F.3d 327 (4th Cir. 2021), is whether the State's decisions with regard to oversight of administration of psychotropic medications is a "substantial departure from accepted professional judgment."  *Id.* at 339 (quoting *Youngberg*, 457 U.S. at 320–23).  Like the case here, *Doe 4 by & through Lopez* concerned a challenge to the adequacy of medical care provided to children in state custody (unaccompanied immigration children detained by the state).  *Id.* at 329. The Fourth Circuit held: "a facility caring for an unaccompanied child fails to provide a

---

[13] The State curiously contends that "[t]here is no real difference between the two standards."  (ECF No. 78-1, citing *Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs.*, 959 F.2d 883, 894 (10th Cir. 1992)).  While the Fourth Circuit advises that it has "not yet explained the precise difference between the standards of professional judgment and deliberate indifference," it nonetheless identifies at least one difference with regard to the requirement of proof of subjective intent.  *Doe 4 by & through Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 985 F.3d 327, 343 (4th Cir. 2021).  The State is correct, though, that both standards require more than mere negligence.  *Id.* at 342.

constitutionally adequate level of mental health care if it substantially departs from accepted professional standards." *Id.* at 342.

The Fourth Circuit's reasoning is instructive:

> In *Patten*, this Court applied the *Youngberg* standard to an involuntarily committed psychiatric patient's claim of inadequate medical care. We concluded that there are "sufficient differences" between "pre-trial detainees" and "involuntarily committed psychiatric patients" to justify the application of *Youngberg*'s professional judgment standard for the latter. This Court explained:
>
> > The most obvious and most important difference is the reason for which the person has been taken into custody. . . . One of the main purposes of such commitment is, of course, to provide treatment. A pre-trial detainee, however, is taken into custody because the state believes the detainee has committed a crime, and the detainee is kept in custody to ensure that he appears for trial and serves any sentence that might ultimately be imposed.
>
> *Patten*, 274 F.3d at 840–41 (internal citations omitted). We then offered two other reasons that justified the use of the *Youngberg* standard instead of deliberate indifference:
>
> > [P]re-trial detainees generally are housed in jails or prisons staffed by law enforcement officials, while involuntarily committed patients generally are housed in hospitals staffed by medical professionals. Finally, while some involuntarily committed patients are confined for short periods of time, many patients face lengthy and even lifelong confinement. Pre-trial detainees, however, usually retain that status for a relatively short period of time, until released on bond or until the resolution of the charges against them.
>
> *Id.* at 841.

*Doe 4 by & through Lopez*, 985 F.3d at 339.

All of these considerations support that children in foster care receiving medical care—*i.e.*, placed in the State's custody involuntarily for treatment and care for indeterminate periods—are more akin to involuntarily committed patients (per *Youngberg*) than pre-trial detainees or

prisoners.  Indeed, the Fourth Circuit's application of the above analysis to the case before it in

*Doe 4 by & through Lopez* is similarly applicable here:

> Applying the same analysis, we hold that the *Youngberg* standard
> governs this case. The statutory and regulatory scheme governing
> unaccompanied children expressly states that these children are held
> to give them care. Such children "shall be promptly placed in the
> least restrictive setting that is in the best interest of the child," 8
> U.S.C. § 1232(c)(2)(A), and any facility housing them must be
> "capable of providing for the child's physical and mental well-
> being." 8 U.S.C. § 1232(c)(3)(A). *Cf. Youngberg*, 457 U.S. at 320
> n.27, 102 S.Ct. 2452 ("[T]he purpose of respondent's commitment
> was to provide reasonable care and safety, conditions not available
> to him outside an institution."). When placing these children in
> settings that will care for them, ORR is responsible for ensuring that
> the children are likely to appear for any legal proceedings, protected
> from individuals who might victimize them, and not "likely to pose
> a danger to themselves or others." 6 U.S.C. § 279(b)(2)(A). To that
> end, ORR "shall hold UACs in facilities that are safe and sanitary
> and that are consistent with ORR's concern for the particular
> vulnerability of minors," 45 C.F.R. § 410.102(c), and "[w]ithin all
> placements, UACs shall be treated with dignity, respect, and special
> concern for their particular vulnerability." 45 C.F.R. § 410.102(d).
> These duties are reflected in SVJC's cooperative agreement with
> ORR, which tasks SVJC with being a "care provider" that will
> provide children with "suitable living conditions," including
> "[a]ppropriate routine medical care ... emergency health care
> services ... [and] appropriate mental health interventions when
> necessary." J.A. 1846.

*Id.* at 339–40.  Given the allegations as to the circumstances of the State's custody of Plaintiffs,

the court agrees with Plaintiffs that *Doe 4 by & through Lopez* provides the operative framework.[14]

On the professional judgment standard, the Fourth Circuit has explained:

> [T]his standard requires more than negligence. "[E]vidence
> establishing mere departures from the applicable standard of care is

---

[14] While the State contends that the Fourth Circuit's decision in *Doe ex rel. Johnson v. South Carolina Department of Social Services*, 597 F.3d 163 (4th Cir. 2010), establishes Plaintiffs must demonstrate deliberate indifference, the court is not persuaded.  First, *Johnson* preceded the Fourth Circuit's later decision in *Doe 4 by & through Lopez*.  Further, as Plaintiffs persuasively assert, *Johnson* did not concern the State's duty to provide adequate medical and mental health care.  (ECF No. 84 at p. 19 n.13.)  And finally, the reasoning set forth by the Fourth Circuit in *Doe 4 by & through Lopez* supports its application upon the facts here.  Notably, however, even were the court to conclude the deliberate indifference standard, Plaintiffs' allegations meet the requisite standard.

insufficient to show a constitutional violation[.]" *Patten*, 274 F.3d at 845. The evidence must show "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323, 102 S. Ct. 2452. Under this standard, courts do not determine the "correct" or "most appropriate" medical decision. *Patten*, 274 F.3d at 845 (internal citation and quotation marks omitted). "Instead, the proper inquiry is whether the decision was so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one." *Id.* (internal citation and quotation marks omitted). By applying this standard, a court "defers to the necessarily subjective aspects of the decisional process of institutional medical professionals and accords those decisions the presumption of validity due them." *Id.* Nonetheless, a decision earns this deference only if it reflects an actual exercise of medical judgment. *See Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

*Doe 4 by & through Lopez*, 985 F.3d at 342–43. "[W]hile *Youngberg* requires 'more than negligence,' it establishes a 'lower standard of culpability compared to the Eighth Amendment standard for deliberate indifference' – an 'objective standard' that 'does not require proof of [an institutional official's] subjective intent.'" *Riddick v. Barber*, 109 F.4th 639, 646 (4th Cir. 2024) (quoting *Doe 4 by & through Lopez*, 985 F.3d at 342–43).

Plaintiffs' allegations are sufficient to plausibly allege that the State has failed to provide Plaintiffs with a "constitutionally adequate level of mental health care." *Doe 4 by & through Lopez*, 985 F.3d at 342. The Amended Complaint is replete with allegations regarding lack of oversight—including failure to ensure necessary medical records are compiled, provided, and considered (for informed consent purposes); failure to consider whether psychotropic medications are appropriate for minor children, especially where "red flags" are present, such a polypharmacy, heightened dosages, and young patients; and failure to consider such red flags or seek out additional opinions when they arise. And Plaintiffs allege, the State was and is aware of these concerns. Plaintiffs' allegations go to matters of informed consent, appropriateness of medical

interventions, and failure to oversee such decisions or even to provide those caring for the children with the ability to do so. These allegations, which are specific in nature, ably allege a serious risk of harm to Plaintiffs. *Cf. Riddick*, 109 F.4th at 646 (noting on a Rule 12(b)(6) motion that it is sufficient to allege facts "from which it may be reasonably inferred that such treatment fell substantially outside the professional standard of care and the bounds of professional judgment").

In view of the foregoing, the court is satisfied that Plaintiffs plausibly allege facts to support the conclusion that the State's actions with regard to administration and oversight of psychotropic medications to Plaintiffs "shock the conscience."

### 2. *Count II: Procedural Due Process Claim*

"Procedural due process ensures that the government employs fair procedures when it seeks to deprive an individual of liberty or property." *Amador v. Mnuchin*, 476 F. Supp. 3d 125, 148 (D. Md. 2020) (citing *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976)). It thus "imposes constraints on governmental decisions" that deprive individuals of such interest. *Mathews*, 424 U.S. at 332. In *Mathews*, the Supreme Court set forth the now well-worn factors to consider in determining if government action deprives an individual's right to procedural due process or whether the government process is constitutionally adequate. *Id.* These include: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). Thus, to plausibly allege a claim of procedural due process, Plaintiffs must plead "(1) 'a constitutionally cognizable life, liberty, or property interest'; (2) a 'deprivation of that interest [ ] caused by some form of state action'; and

(3) 'that the procedures employed were constitutionally inadequate.'" *Todman v. Mayor & City Council of Baltimore*, 631 F. Supp. 3d 314, 327 (D. Md. 2022), *aff'd,* 104 F.4th 479 (4th Cir. 2024) (quoting *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013)).

The State urges that Plaintiffs fail to allege a plausible claim that the existing processes deprive them of due process, and that their facial challenge to the constitutionality of the Psychotropic Policy fails as a matter of law.  (ECF No. 78-1 at pp. 17–27.)

a.  Existing Process Available

The State first contends, pursuant to the second *Mathews* factor, that (on the facts alleged), no reasonable conclusion could be drawn that Plaintiffs have suffered a violation of procedural due process because they could have "raised their concerns or sought relief in their ongoing state juvenile court proceedings." (ECF No. 78-1 at p. 18.)  As the State notes, a constitutional violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990).  Thus, "[a] procedural due process violation arises not upon the occurrence of a deprivation but rather the failure of due process in connection with the deprivation." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 149 (4th Cir. 2014) (citing *Zinermon,* 494 U.S. at 125).

Accordingly, "to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate," examining "the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute." *Zinermon*, 494 U.S. at 126.  "Rather than a meticulous examination of the minutiae of the state's procedural rubric, 'procedural due process is simply a guarantee' that there is notice and an opportunity to be heard." *Snider*, 739 F.3d at 149 (quoting *Mora v. City of Gaithersburg, Md.,* 519 F.3d 216, 230 (4th Cir.

2008)).  Further, it is "flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

While it is true that procedural due process does not "*always* require[] the State to provide a hearing prior to the initial deprivation," *see Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (emphasis in original) (citation omitted), it does not follow that the State may unilaterally act to deprive foster children of their liberty interests in reliance that ongoing juvenile court proceedings will fill the hole left by the procedure deprivation at the front end.  And Supreme Court precedent generally provides that "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."  *Zinermon*, 494 U.S. at 127 (emphasis in original) (citing cases). Importantly, the law is clear that it is the exception, not the rule, that a post-deprivation process will satisfy due process.  *See, e.g.*, *Gilbert*, 520 U.S. at 930 (noting "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause" and citing cases as to same); *Zinermon v*, 494 U.S. at 128 (citing cases regarding necessity of quick action by state and the impracticality of providing process, where the potential length or severity of the deprivation did not indicate serious loss, and post-deprivation procedures were reliable); *Presley v. City Of Charlottesville*, 464 F.3d 480, 489 (4th Cir. 2006) (noting that "absent the necessity of quick action by the State or the impracticality of providing any predeprivation process, a post-deprivation hearing [is] constitutionally inadequate") (quoting *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 436 (1982)).

Regardless, the State does not persuade the court that the juvenile court process resolves the alleged procedural due process violation (even absent the above precedent that such a process is generally inadequate absent "quick action" circumstances).  The juvenile court process the State points to is not tailored to the provision or administration of psychotropic medications; rather it

pertains to general oversight of CINAs.  Further, the State does not suggest or argue that process through the juvenile court may be (or should be) utilized before psychotropic medications are prescribed, and identifies no specific juvenile court process or procedure related to the provision of same (as opposed to the juvenile court's general oversight).

The reasoning of the *Bryan C.* court is compelling:

> The Defendants also point to the judicial oversight by the Maine District Court, which they characterize as being "[c]ategorically . . . adequate process under the Due Process [C]lause." Defs.' Mot. 25. But post-deprivation procedures such as judicial oversight may be inadequate if "the state is in a position to provide for predeprivation process." *San Geronimo Caribe Project, Inc. v. Acevedo-Vila*, 687 F.3d 465, 479 (1st Cir. 2012) (en banc) (quoting *Hudson v. Palmer*, 468 U.S. 517, 534, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). "Whether the opportunity [for due process] needs to be furnished before the seizure or whether a post-seizure opportunity is sufficient depends on the circumstances." *Herwins v. City of Revere*, 163 F.3d 15, 18 (1st Cir. 1998). "Where feasible, the opportunity (for obvious reasons) is expected to be pre-deprivation ...." *Id.* Post-deprivation opportunity is only sufficient where quick action is required or where the provision of any meaningful pre-deprivation process is impractical. *Id.* The Defendants make no argument that pre-deprivation process is not possible here.

*Bryan C. v. Lambrew*, 340 F.R.D. 501, 520 (D. Me. 2021).  Plaintiffs here allege a lack of process. That the juvenile court is generally available to Plaintiffs does not persuade the court that their claim fails as a matter of law.

Also as to the second *Mathews* factor, the State argues that its existing monitoring procedures are constitutionally sufficient.[15]  The State's arguments, however, rest on what it urges are applicable statutes and policies, not Plaintiffs' allegations.  (The court separately analyzes the State's arguments as to Plaintiffs' facial challenge.)  The State neglects that Plaintiffs allege what amount to systemic violations of the Psychotropic Policy and the State's recordkeeping

---

[15] The court addressed *supra* its conclusion that Plaintiffs plausibly allege a private interest affected by official action. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

obligations—that children's caregivers (and medical providers) are not given complete medical records before being tasked with prescribing (for providers) and caring for (for caregivers) children in the administration of psychotropic medications; that children are not engaged in discussions regarding prescription of psychotropic medication; that the State's consent as to same amounts to a rubber stamp; and that the State consents to treatment of children with psychotropic medications despite awareness of material red flags and research to the contrary (as to the too many, too much, and too young problems).  In all, Plaintiffs allege the State fails to follow its policies and fails to respond to what it acknowledges are known deficiencies in its oversight of these processes. Further, as discussed above, the court is not persuaded that the mere existence of an ongoing juvenile court proceeding that oversees all aspects of a CINA petition is sufficient to defeat Plaintiffs' allegations of a lack of process particular to psychotropic medications.  Against this backdrop, the court finds Plaintiffs plausibly allege that the procedures in place risk erroneous deprivation of Plaintiffs' interest in being free from unwanted, unsafe, or unnecessary medication.

The court similarly does not find the State's assertion as to its interest in avoiding fiscal and administrative burdens compelling at this stage.  The alleged failings result from the State's violation of its own policies.  Therefore, suggestion that fiscal and administrative burdens are too great when the State itself implemented (or agreed to) the very practices/policies it is alleged not to carry out is generally unpersuasive.   With regard to the question of secondary review, the court appreciates the State's contention that implementation of such process may impose a great burden. The State's argument, however, is cursory and largely speculative, and therefore unpersuasive, particularly in the face of Plaintiffs' specific allegation that the State acknowledges the need for review based on apparent red flags regarding prescription of psychotropic medication to children in foster care.

The court is persuaded that Plaintiffs adequately and plausibly plead a violation of procedural due process.

   b.   <u>Facial Challenge to the Constitutionality of the Psychotropic Policy</u>

The State further contends that Plaintiffs cannot satisfy the high standard of challenging the Psychotropic Policy as unconstitutional on its face.   Plaintiffs' facial challenge to the constitutionality of the Psychotropic Policy rests on the following alleged inadequacies:

> Failure to assure that an adequate process is undertaken to meaningfully engage biological parents/legal guardians in informed consent decision-making in relation to the administration of psychotropic medications to children, including the absence of adequate definition in state policy regarding the circumstances in which a parent or guardian is considered "unavailable" or "unwilling" to provide consent;
>
> Failure to require that children and youth possessing adequate mental capacity to make psychotropic medication treatment decisions are engaged in the informed consent process, including the absence of policy language addressing the capacity of children below the age of 16 to form an informed decision whether to assent to a psychotropic medication and the process to be undertaken to determine the child's capacity;
>
> Failure to require that an independent, secondary review by a child psychiatrist occurs in relation to the prescription and administration of higher risk psychotropic medications and combinations of psychotropic medications to children, including the absence of policy language providing for an independent review process and identifying those outlier or clinically suspect prescriptions that trigger the need for a mandatory secondary review;
>
> Failure to require that the person designated by the State to undertake the informed consent role on behalf of a child is sufficiently knowledgeable regarding the child's medical and mental health history, including the absence of policy language requiring the person assigned informed consent authority (the LDSS Director or Assistant Director) to review pertinent medical and mental health records and to interview knowledgeable individuals (such as the child's caseworker, the supervisor, and the child's assigned foster parent(s)) in preparation for making the informed consent decision;

Failure to require that informed consent for the administration of psychotropic medications to children is valid only for a set duration; and

Failure to assure that informed consent for the administration of psychotropic medications to children is conditioned on the timely completion of laboratory testing and follow-up medical care.

(ECF No. 75 ¶ 138.)

While the court sees the wisdom in Plaintiffs' urgence that the Psychotropic Policy would surely benefit from these improvements, the court is not persuaded that the listed failures or omissions of the Psychotropic Policy, under a permissive and flexible read of the law, could render it unconstitutional on its face, or in violation of procedural due process in all circumstances. On a facial challenge, the court considers whether the challenged practice, here the Psychotropic Policy, is "capable of constitutional applications." *Elhady v. Kable*, 993 F.3d 208, 217 (4th Cir. 2021).

While the court's "inquiry about the process due is flexible and depends on context," the "fundamental requirements of due process are 'notice and an opportunity to be heard.'" *Doe v. Virginia Polytechnic Inst. & State Univ.*, 77 F.4th 231, 236 (4th Cir. 2023) (first quoting *Mathews*, 424 U.S. at 334; then quoting *Mallette v. Arlington Cnty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 640 (4th Cir. 1996)). Plaintiffs' allegations do not meaningfully challenge these aspects. That the process may be improved by additional measures is not the yardstick the court uses to evaluate the sufficiency of claim of facial unconstitutionality. The Psychotropic Policy contemplates judicial assignment of a designated individual to provide informed consent and communication with the parent or legal guardian when this occurs; it requires communication by the caseworker and prescribing physician with the child regarding the medication; it requires regular medical intervention and check ins regarding the use of psychotropic medication. That the

44

State may routinely fail as to each of these mandates surely supports a plausible due process violation, but that does not inform the court's analysis as to whether Plaintiffs plausibly allege the Psychotropic Policy is unconstitutional on its face.

Further, Plaintiffs allege that the Psychotropic Policy fails on its face to provide an opportunity for assent by children under 16.  But Plaintiffs' allegations neglect that children under 16 cannot assent to such treatment under Maryland law, and that the Psychotropic Policy nonetheless does require communication with the child regarding the medication.  Again, that the State has perhaps systematically eroded the effectiveness of the Psychotropic Policy by utilizing uninformed (or unauthorized) decisionmakers, and by failing to actually engage the child (as required) may well violate a child's procedural due process rights, but that is not the court's concern on Plaintiff's facial challenge.

Among other things, the Psychotropic Policy imposes authorization criteria and requirements as to who may prescribe psychotropic medications; requires consideration of certain information before doing same; and requires LDSS consent, pursuant to the court's oversight of child custody.  On its face, the Psychotropic Policy is not without "procedural safeguards to ensure [children's] interest are taken into account," *Washington v. Harper*, 494 U.S. 210, 233 (1990); nor does it fail to call for consideration of a child's background, *see Parham v. J. R.*, 442 U.S. 584, 606–07 (1979), or lack procedure for periodic review, *see Johnson v. Solomon*, 484 F. Supp. 278, 293 (D. Md. 1979)—especially when considering regular reviews in the juvenile court.  That those procedural safeguards may fail or not be followed (even on a systemic basis), does not support a plausible inference that the State's Psychotropic Policy which provides for such measures is facially unconstitutional.

For the foregoing reasons, the court agrees with the State that Plaintiffs' procedural due process claim based on their facial challenge to the State's Psychotropic Policy fails as a matter of law, and they may not proceed on that aspect of the Amended Complaint.  Importantly, however, as set forth above, Plaintiffs otherwise plausibly allege violations of their procedural due process rights, and may proceed accordingly.

## C.  Count III: AACWA

Finally, the State argues that Plaintiffs' Count III under AACWA fails as a matter of law because AACWA does not confer federal rights actionable under section 1983.  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred,'" including, relevant here, the Fourth Amendment.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n.3 (1979)).  Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "[T]o seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*"  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).

Spending-power legislation, the Supreme Court has explained, "cannot provide the basis for a § 1983 enforcement suit unless Congress 'speaks with a clear voice, and manifests an unambiguous intent to confer individual rights.'"  *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 374 (2025) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002)).  Indeed, "[t]hough it is rare enough for any statute to confer an enforceable right, spending-power statutes . . . are

especially unlikely to do so." *Id.* at 369. This is because "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (quoting *Gonzaga*, 536 U.S., at 280). "[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action." *Gonzaga Univ.*, 536 U.S. at 290. It is not enough that plaintiffs "fall 'within the general zone of interest that the statute is intended to protect.'" *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (quoting *Gonzaga*, 536 U.S., at 283).

"To prove that a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms,'" and that it "display[s] 'an unmistakable focus' on individuals like the plaintiff." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (quoting *Gonzaga Univ.*, 536 U.S. at 284, 290). The Supreme Court in *Medina* disclaimed the factors set forth in its 1997 decision in *Blessing v. Freestone*, 520 U.S. 329 (1997), to the extent they require any less than a "clear and unambiguous" notice that a federal spending power statute creates a personally enforceable statute. *Medina*, 606 U.S. at 376 (explaining "*Gonzaga* 'rejected' any reading of our prior cases that would 'permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983'" (citation modified) (quoting *Gonzaga Univ.*, 536 U.S. at 283)).

Just days ago, the Fourth Circuit held that a provision in the Medicaid Act did not confer a privately enforceable right when assessed against *Medina*:

First, like the Medicaid Act provision at issue in *Medina*, neither the comparability nor availability requirement uses "clear and unambiguous rights-creating language." *Id.* at 377–78 (quoting *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 186 (2023) (internal quotation marks omitted)). Instead, the availability requirement "indicates that state Medicaid plans" must "provide for making medical assistance available . . . to" eligible individuals, "including at least" an enumerated list of "care and services." *Id.* at 377; § 1396a(a)(10)(A). And the comparability requirement, found in the next subparagraph, "indicates that state Medicaid plans" must "provide . . . that the medical assistance made available to any individual" covered by the availability requirement "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." *Medina*, 606 U.S. at 377; § 1396a(a)(10)(B). Just like the any qualified-provider provision, these requirements "speak[] to what a State must do to participate in Medicaid" and to ensure it does not "lose federal funding." *Medina*, 606 U.S. at 377. But they do not mention rights, of patients or anyone else. Even if the requirements exist for the "benefit" of "patients," this fact alone does not create a right— especially where the statutory language does not mention rights of any kind and focuses solely on the obligations of a State in the context of a spending-power bargain. *Medina*, 606 U.S. at 377–78.

*Anderson v. Crouch*, — F. 4th. — , Case No. 22-1927, 2026 WL667919, *12 (4th Cir, Mar. 10, 2026).

Plaintiffs here assert that the relevant statutory provisions of AACWA, 42 U.S.C. §§ 671(a)(16), 675(1), 675(5), unambiguously confer rights to them, as children in foster care. AACWA "establishes a federal reimbursement program for certain expenses incurred by the States in administering foster care and adoption services." *Suter v. Artist M.*, 503 U.S. 347, 350–51 (1992). It "provides that States will be reimbursed for a percentage of foster care and adoption assistance payments when the State satisfies the requirements of the Act," including that the State "submit a plan to the Secretary of Health and Human Services for approval by the Secretary." *Id.* at 351 (citing 42 U.S.C. §§ 672–674, 675(4)(A)). As the Southern District of West Virginia has noted, "[t]he Fourth Circuit's jurisprudence on § 671(a)(16)," in particular, "is anything but cut-

and-dry." *Jonathan R. v. Just.*, No. 3:19-CV-00710, 2023 WL 184960, at *14 (S.D.W. Va. Jan. 13, 2023). The court addresses first a brief review of Fourth Circuit precedent before turning to its consideration of the *Gonzaga* factors.

In 1988, the Fourth Circuit considered an appeal of this court's entry of a preliminary injunction. *L.J. By & Through Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988), *abrogated by Suter v. Artist M.*, 503 U.S. 347 (1992) ("*L.J. I*").[16] In that case:

> Plaintiffs, present or former foster children in the custody of the Baltimore City Department of Social Services, sued twenty-one state and city officials, caseworkers and supervisors who played a role in administering Maryland's federally-funded foster care program in Baltimore City. They alleged that, as a result of defendants' maladministration of the program, they were victims of physical and sexual abuse as well as medical neglect. They sought broad interim and permanent injunctive relief to redress the deficiencies in the administration of the program and money damages.

*Id.* at 119. The Fourth Circuit considered whether 42 U.S.C. §§ 671(a)(1), (a)(9), and (a)(16) were privately enforceable under § 1983. *Id.* at 123. It answered in the affirmative:

> Taken together we think that these statutory provisions spell out a standard of conduct, and as a corollary rights in plaintiffs, which plaintiffs have alleged have been denied. It is true that the statutes are largely statutes relating to appropriations, but, defendants' argument to the contrary notwithstanding, they are privately enforceable under 42 U.S.C. § 1983. *See Miller v. Youakim,* 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

*Id.*

Subsequently, caselaw eroded (or at least challenged) the holding in *L.J. I*. First, in 1992, the Supreme Court decided *Suter v. Artist M.*, 503 U.S. 347 (1992). There, the Court recognized

---

[16] For clarity, the court refers to *L.J. I* and *L.J.II*, but acknowledges this differs from the Fourth Circuit's assigned abbreviations (which were based on the district court decisions not material here).

that neither § 671(a)(9) nor § 671(a)(15) of AACWA was privately enforceable. *Id.* at 363. Then, in 1997, the Fourth Circuit considered AACWA § 671(a)(10) and held it did not create an enforceable right. *White by White v. Chambliss*, 112 F.3d 731, 739 (4th Cir. 1997).

Thereafter, the *L.J.* defendants filed a motion to vacate the 1988 consent decree, which the district court denied. The Fourth Circuit addressed the appeal of the district court's denial in *L.J. v. Wilbon*, 633 F.3d 297 (4th Cir. 2011) ("*L.J. II*"). In that *L.J. II*, the Fourth Circuit found: "The fact that *Suter* found no private right of action under § 671(a)(15) and § 671(a)(9) does not void our holding in [*L.J. I*] that the rights asserted by plaintiffs under § 671(a)(16) are privately enforceable under 42 U.S.C. § 1983." *Id.* at 310. Further, it explained, "we cannot say that this court's prior finding that § 671(a)(16) creates a private right of action is 'dead wrong.'" *Id.* at 312. However, the *L.J. II* court carefully clarified its holding: "To be clear, we do not now hold that § 671(a)(16) provides a private right of action. We simply hold that Appellants failed to show that the 'law of the case' to that effect established by [*L.J. I*] was overruled or 'dead wrong.'" *Id.*

The court now turns to the asserted provision of AACWA that Plaintiffs contend unambiguously confer individual rights. In relevant part here, 42 U.S.C. § 671(a)(16) sets forth the requisite features of a State's plan under AACWA, and provides that "for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides for the development of a case plan . . . for each child receiving foster care maintenance payments under the State plan." 42 U.S.C. § 671(a)(16). A "case plan," defined at 42 U.S.C. § 675(1), refers to, relevant here, "a written document" that includes "[t]he health . . . records of the child, including the most recent information available regarding . . . the names and addresses of the child's . . . providers," "a record of the child's immunizations," "the child's known medical

problems," "the child's medications," and "any other relevant health . . . information concerning the child determined to be appropriate by the State agency." 42 U.S.C. § 675(1)(C).

The relevant portion of 42 U.S.C. § 671(a)(16) as to the case review system provides, of the State plan, "for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child[.]" 42 U.S.C. § 671(a)(16). A case review system, defined at 42 U.S.C. § 675(5), refers to, relevant here, "a procedure for assuring that . . . a child's health . . . record . . . is reviewed and updated, and a copy of the record is supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care, and is supplied to the child at no cost at the time the child leaves foster care if the child is leaving foster care by reason of having attained the age of majority under State law." 42 U.S.C. § 675(5)(D).

Considering the *Gonzaga* factors, *Medina*'s strong admonition related to same, and the Fourth Circuit's subsequent analysis applying *Medina*, the court is not persuaded that the AACWA provisions at issue unambiguously confer individual rights to Plaintiffs. To conclude as such, the provisions of AACWA must provide for the creation of rights "in clear and unambiguous terms." *Gonzaga Univ.*, 536 U.S. at 290. They must use "rights-creating terms." *Medina*, 606 U.S. at 368 (quoting *Gonzaga Univ.*, 536 U.S. at 284). While the Fourth Circuit's decision in *Anderson* concerned Medicaid Act provisions (as in *Medina*), its general analysis is instructive here. The Fourth Circuit noted that a provision that required States to provide medical assistance to eligible individuals, with an enumerated list of care and services, was not sufficient to show "rights-creating language." *Anderson*, 2026 WL 667919, at *12. Further, provisions that "speak[] to what a State must do to participate" or receive funding do not support an unambiguously conferred right.

51

*Id.* (quoting Medina, 606 U.S. at 377). The Fourth Circuit continued: "Even if the requirements exist for the 'benefit' of 'patients,' this fact alone does not create a right—especially where the statutory language does not mention rights of any kind and focuses solely on the obligations of a State in the context of a spending-power bargain." *Id.* (quoting *Medina*, 606 U.S. at 377–78).

The Supreme Court's cited example in *Medina* provides still additional instruction on the type of language that reflects Congress's intent to clearly and unambiguously confer a right:

> [Federal Nursing Home Reform Act (FNHRA)] offers an example almost perfectly on point. One of its provisions gives nursing-home residents the right to choose their own attending physicians. Here is the provision in context:
>
> "(c) Requirements relating to residents' *rights*
>
> > "(1) General *rights*
> >
> > "(A) Specified *rights*
> >
> > "A nursing facility must protect and promote the *rights of each resident*, including each of the following *rights*:
> >
> > "(i) Free choice
> >
> > "The *right* to choose a personal attending physician ...." § 1396r(c) (emphasis added).
>
> As this language shows, Congress knows how to give a grantee clear and unambiguous notice that, if it accepts federal funds, it may face private suits asserting an individual right to choose a medical provider.

606 U.S. at 378 (emphasis in original).

Here, the identified language, like that in *Anderson* and *Medina*, includes obligations of the State to individuals (here, "each child"; there, eligible individuals), as well as the services to be provided. This language does not constitute "clear and unambiguous rights-creating language," but rather speaks only to obligations of the State under AACWA for funding purposes. The

provisions "do not mention rights, of [children in foster care] or anyone else." *See Anderson*, 2026 WL 667919, at *12, and *Medina*, 606 U.S. at 378, *supra*.

On this point, the *Jonathan R. v. Justice* court detailed:

> Section 671(a)(16) stands in stark contrast to statutes that *do use* rights-creating language. Take Title VI for instance. It provides that "[n]o person ... shall, on the ground of race, color, or national origin ... be subjected to discrimination." 42 U.S.C. § 2000d. Title IX uses near-identical language: "No person ... shall, on the basis of sex ... be subjected to discrimination." 20 U.S.C. § 1681(a). Congress could have easily written § 671(a)(16) in a similar fashion, using an individual focus. Congress could have said, for example, that "each child shall have a case plan and a case review system." Such "individually focused terminology," "phrased in terms of the person[ ] benefitted," would have shown congressional intent to create an individual right. *Gonzaga*, 536 U.S. at 284, 287. But Congress chose not to focus on the individual. And since Congress "knows how to ... expressly" "create a private cause of action" when it wants, *Carey v. Throwe*, 957 F.3d 468, 479 (4th Cir. 2020), § 671(a)(16)'s focus on the person regulated is telling.

No. 3:19-CV-00710, 2023 WL 184960, at *16 (S.D.W. Va. Jan. 13, 2023).

The court acknowledges that other courts have previously found such language sufficient to show Congress intended to confer enforceable individual rights. Against the backdrop of *Gonzaga*, the Court's reaffirmation of the strict test in *Medina*, and the Fourth Circuit's recent decision in *Anderson*, however, this court is not persuaded by those decisions in this instance.

Accordingly, the court will grant the State's Motion to the extent it seeks dismissal of Count III.

## IV.   **CONCLUSION**

For the reasons set forth herein, by separate order, the State's Motion will be granted in part and denied in part.

53

March __12__, 2026                          /S/
                                            _____
                                            Julie R. Rubin
                                            United States District Judge